**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

Civil Action No. 17-cv-00131-MSK-MJW

**KELSEY OLDERSHAW,**
**BAMBI AUGUSTIN,**
**DENISE LANDIN,**
**ELINA NAVARRO, and**
**JANE STANT,**

      **Plaintiffs,**

v.

**DAVITA HEALTHCARE PARTNERS, INC., and**
**TOTAL RENAL CARE, INC.,**

      **Defendants.**

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS
FOR SUMMARY JUDGMENT**

---

    **THIS MATTER** comes before the Court pursuant to the Defendants' (collectively,

"DaVita") Motions for Summary Judgment against each Plaintiff (**# 57, 58, 59, 60, 61**), the

Plaintiffs' respective responses (**# 68, 67, 70, 66, 69**), and DaVita's respective replies (**# 76, 74,**

**77, 75, 73**).  Also pending are two motions (**# 38, 50**) by DaVita to amend its Answer, the

Plaintiffs' responses (**# 44, 54**), and DaVita's replies (**# 45, 55**).

## FACTS

    The Court briefly summarizes the pertinent facts here and elaborates as necessary in its

analysis.  The Plaintiffs are five female former employees of DaVita.  Although the Plaintiffs

have joined their claims in this action, there is relatively little factual overlap in their allegations,

as each Plaintiff had a different job title, different supervisor, was subject to different allegedly

discriminatory acts, and suffered different injuries. The different Plaintiffs assert varying claims of age discrimination, sex discrimination, disability discrimination, and/or prohibited retaliation, arising under both Colorado and federal law.

DaVita has moved for summary judgment on all claims by each Plaintiff. Separately, DaVita has moved to amend its Answer to add After-Acquired Evidence as an affirmative defense to bar to recovery by Ms. Oldershaw **(# 38)** and Ms. Landin **(# 50).** This defense is based on DaVita's discovery that both women had secretly recorded workplace conversations, allegedly in violation of DaVita policies.

## ANALYSIS

### A.  Summary Judgment Motions

1.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law determines which facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party,

thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

2. General legal standards

The Plaintiffs' disparate treatment claims arise under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-401 *et seq.* Claims under all of these statutes are analyzed similarly, applying the familiar *McDonnell-Douglas*

burden-shifting framework (albeit with slight variations as noted herein).  *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 636 (10th Cir. 2012) (ADEA); *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 884 (10th Cir. 2018) (Title VII); *Kilcrease v. Domenico Transportation Co.*, 828 F.3d 1214, 1220 (10th Cir. 2016) (ADA); *Williams v. Department of Public Safety*, 369 P.3d 760, 771 (Colo.App. 2015) (CADA).  Under this paradigm, each Plaintiff bears the initial burden of establishing a *prima facie* case by showing: (i) that she belongs to the requisite protected class; (ii) that she had the minimum objective qualifications required for the job she held (or the employment benefit she sought); (iii) that she suffered an adverse employment action; and (iv) that the adverse action occurred in circumstances giving rise to an inference of discrimination.  If the Plaintiff meets that initial burden, DaVita then bears the burden of articulating a legitimate, non-discriminatory reason for the adverse action, and the Plaintiff bears the ultimate burden of demonstrating that DaVita's proffered reason is a pretext for prohibited discrimination.[1]  *Id.*

Certain Plaintiffs also assert that they subjected to impermissible retaliation for having invoked rights under the ADEA, ADA, Title VII, or CADA.  Like disparate treatment claims, retaliation claims under each of these statutes are analyzed according to the same standards. *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315-16 (10th Cir. 2017) (Title VII); *Nealey v. Water District No. 1*, 324 Fed.Appx. 744, 748 (ADA and ADEA); *Agassounon v. Jeppesen Sanderson, Inc.*, 688 Fed.Appx. 507, 509 (10th Cir. 2017) (CADA).  The Plaintiffs must first

---

[1]     Under Title VII, the ADA, and CADA, the Plaintiffs must ultimately demonstrate that their membership in the protected class was a <u>motivating factor</u> in DaVita's decision to take the adverse action against them. 42 U.S.C. § 2000e–2(m) (Title VII); *Hamilton v. Oklahoma City Univ.*, 911 F.Supp.2d 1199, 1207 (W.D. Ok. 2012) (ADA); *Colo. Civ. Rights Com'n v. Big O Tires, Inc.*, 940 P.2d 397, 401 (Colo. 1997) (CADA).  Under the ADEA, the Plaintiffs must show that, <u>but for</u> their age, they would not have suffered the adverse action.  *Gross v. FBL Financial Servs.*, *Inc.*, 557 U.S. 167, 177 (2009).

establish a *prima facie* case by showing that: (i) they engaged in an activity protected by the relevant statute; (ii) they suffered an adverse employment action; and (iii) there is a causal connection between the adverse action and the protected conduct. If they carry that burden, DaVita must articulate a legitimate, non-retaliatory reason for the adverse action, and the Plaintiffs must ultimately show that the proffered reason is a pretext for retaliation. *Id.*

With these standards in mind, the Court turns to each Plaintiff's individual claims.[2]

3. <u>Ms. Augustin</u>

Ms. Augustin was hired by DaVita as a Recruitment Manager in 2012, when she was approximately 56 years old. Beginning in 2015, Amy Denvir, Ms. Augustin's supervisor, began criticizing Ms. Augustin's performance, commenting that Ms. Augustin was not a "driver" and was not sufficiently "aggressive."[3]

In late 2015, Ms. Denvir proposed elimination of Ms. Augustin's position and creation of another position titled "Senior Manager." In discussions about the Senior Manager position, Ms. Augustin concluded that the position was effectively identical to the job she was already performing, an issue that she raised with Ms. Denvir. Ms. Denvir insisted that the tasks to be

---

[2]      Unless otherwise noted, the Court derives the factual discussions herein from the Plaintiffs' version of events.

[3]      Ms. Augustin's brief seems to suggest that these statements should be understood to be code for Ms. Denvir's desire for a younger employee. But Ms. Augustin's deposition testimony does not clearly make such a link. Asked what she understood Ms. Denvir's comments about wanting a more "aggressive" employee to mean, Ms. Augustin testified that she understood Ms. Denvir to mean "more assertive with the staff" and that such a demand "didn't concern me." Similarly, when asked why Ms. Denvir "did not want you in the position because you weren't driven," Ms. Augustin explained that "I wasn't hard enough on the staff." When asked why she believed that instructions to be tougher on the staff constituted criticism because of her age, Ms. Augustin testified "Because being more aggressive or more of a driver personality would be able to get the results out of the team. I don't feel she thought I had the capabilities of doing that."

The only comment from Ms. Denvir that Ms. Augustin describes that clearly relates to Ms. Augustin's age are periodic comments by Ms. Denvir that Ms. Augustin "didn't look as old as [she] was."

performed in the Senior Manager position differed from those performed by Ms. Augustin. In particular, the Senior Manager would be conducting phone recruiting. Ms. Denvir observed that other duties that Ms. Augustin was performing as Recruitment Manager, such as marketing, advertising, budgeting, and planning, would not be accounted for in the Senior Manager position, and that she would likely to continue performing those functions. Ms. Denvir suggested that Ms. Augustin write up a proposal for a position that encompassed these tasks and that Ms. Denvir would present it for consideration to her supervisors.

A few days later, a formal job description for the Senior Manager position was posted. Ms. Augustin thought that "it was basically my current job description. . . . [I]t had been reworded slightly, but it was basically what I was doing, and there was no mention of phone work anywhere in the job description." Ms. Augustin e-mailed Ms. Denvir about the job description, observing that "it looks like everything I discussed is going to be the responsibility of this new position." Ms. Denvir responded that "All of the aspects that you're doing are in the job descriptions, that's part of the whole department so [ ] it's in the job description as either doing or insuring it gets done. Does that help?" Ms. Augustin considered applying for the Senior Manager position, but felt that Ms. Denvir had lied about her intentions for the position and that "tempered [Ms. Augustin's] interest in the position." Ms. Augustin also had a discussion with Colleen Herbranson, her former supervisor, and expressed concerns that Ms. Denvir "did not want me in the [Senior Manager] position." Ms. Augustin testified that Ms. Herbranson "basically agreed with me."[4] Thus, Ms. Augustin chose not to apply for the Senior

_____

[4]       Ms. Augustin has not tendered an affidavit from Ms. Herbranson or any other evidence that would eliminate the hearsay character of Ms. Augustin proffering an out-of-court statement by Ms. Herbranson for its truth. The Court will assume that Ms. Herbranson's alleged statement might be admissible to show Ms. Augustin's state of mind – that is, Ms. Augustin acted a certain

Manager position. Instead, she continued working on a proposal for another position containing the tasks she wanted to perform, and eventually presented it to Ms. Denvir.

Ms. Denvir ultimately selected Alyssa Roth, who was under the age of 40 and less-qualified than was Ms. Augustin for the Senior Manager position. Ms. Augustin presented her proposal for another position to Ms. Denvir, and Ms. Denvir presented the proposal to her supervisor, but the supervisor vetoed the request to create another new position. Ms. Augustin was laid off in May 2016.

Based on these facts, Ms. Augustin asserts two claims: (i) age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and (ii) age discrimination in violation of the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-401 *et seq.*

DaVita's summary judgment motion challenges Ms. Augustin's ability to establish the fourth element of the *prima facie* case – circumstances giving rise to an inference of discrimination – and contends that Ms. Augustin cannot show that DaVita's reason for not hiring her as Senior Manager – that she did not apply for the position – is pretextual.

The Court quickly dispenses with the *prima facie* case: Ms. Augustin is protected by both the ADEA and CADA, insofar as she is over 40 years old. There is no dispute that she was qualified for her position as Recruitment Manager, or that she had the objective qualifications for the Senior Manager position. And there is no doubt that her termination (be it described as a layoff or replacement or otherwise) constitutes an adverse employment action. Finally, Ms. Augustin has shown that her termination occurred in circumstances giving rise to an inference of

way because she thought Ms. Herbranson made the statement – but the hearsay rule prevents the Court from taking as true the fact that Ms. Herbranson indeed said such a thing.

age discrimination, insofar as her ostensible replacement, Ms. Roth, was substantially younger than she was. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).

DaVita has proffered a non-discriminatory explanation for why Ms. Augustin was not selected for the Senior Manager position - that she did not apply for it.[5] The Court finds that Ms. Augustin has not come forward with evidence to suggest that this explanation is a pretext for age discrimination. Indeed, DaVita's explanation is indisputably true: Ms. Augustin admits that she did not apply for the Senior Manager position.

Ms. Augustin seeks to evade the significance of her decision not to formally pursue the Senior Manager position by arguing that "Ms. Denvir went out of her way to ensure that Ms. Augustin would not apply," seemingly suggesting that it would have been futile for her to do so. She lists five facts that she contends support that conclusion. First, she notes that Ms. Denvir made comments about wanting someone "aggressive" for the position. Ms. Augustin's own testimony was that she understood this comment to reflect that Ms. Denvir wanted someone "more assertive with the staff," and Ms. Augustin stated that such a comment "didn't concern her."[6] Second, Ms. Augustin argues that Ms. Denvir lied about the Senior Manager's job

_____

[5] The Court does not understand Ms. Augustin to contend that DaVita's initial decision to abolish the Recruitment Manager position and reconstitute it as Senior Manager was itself discriminatory. Although it may be unorthodox for a business to engage in such shuffling (and require incumbent employees to reapply for their existing jobs), DaVita's motion offers a lengthy explanation of a reorganization plan that triggered the job re-characterization, and Ms. Augustin has not disputed any of the facts recited by DaVita about the reasons for that reorganization. In any event, Ms. Augustin has not identified the person who decided to abolish and re-characterize the job, much less come forward with evidence to suggest that such a decision was the product of age bias by that decisionmaker.

[6] In any event, even if Ms. Denvir did not consider Ms. Augustin to be sufficiently aggressive with the staff, Ms. Augustin has offered no evidence to suggest that a sufficient level of aggressiveness was something that only younger applicants might have. Without additional evidence demonstrating that Ms. Denvir was using "aggressiveness" as a proxy or code for "youth" – and Ms. Augustin offers only her own speculation on that point – there is no reason to

responsibilities in her first meeting with Ms. Augustin. Although it appears that Ms. Denvir's

initial description of the Senior Manager job as being more focused on phone recruiting turned

out to be an incorrect statement of the job's actual duties, Ms. Augustin offers only her own

hypothesis that Ms. Denvir misstated the job's responsibilities intentionally and purposefully, as

compared to there being a simple miscommunication or misunderstanding on one or both

women's parts. Even assuming that Ms. Denvir initially misrepresented the Senior Manager job,

it is clear that Ms. Augustin was later able to review the formal job description and confirm with

Ms. Denvir that the formal job description more or less encompassed all of her current duties as

Recruitment Manager. Thus, Ms. Augustin was fully aware of what the Senior Manager position

entailed when she chose not to apply for it. To the extent that Ms. Augustin decided not to apply

for the job because she no longer trusted Ms. Denvir, that too appears to have been a choice

made by Ms. Augustin, not a decision forced upon her because of her age.

Third, Ms. Augustin argues that Ms. Denvir "refus[ed]to follow up with Ms. Augustin's

questions" and "encourag[ed] Ms. Augustin to waste her time on an identical position proposal."

Once again, this seems to overstate the record. The only apparent instance of Ms. Augustin

posing questions to Ms. Denvir about the position was the e-mail exchange between the women

following the posting of the official Senior Manager job description. Ms. Augustin argues that

Ms. Denvir's response to the e-mail was somehow "ambiguous," but the Court sees no ambiguity

in Ms. Denvir confirming that "all the aspects of what you're doing" as Recruitment Manger "are

in the job" of Senior Manager. As to Ms. Denvir encouraging Ms. Augustin to "waste her time"

on a proposal for a separate position consisting of the tasks she wanted to perform, the Court is

perplexed. By the time she submitted the proposal, Ms. Augustin had seen the Senior Manager

---

conclude that Ms. Denvir's comments are indicative of age discrimination, rather than simple
dissatisfaction with Ms. Augustin's style.

job description, concluded that it encompassed all of her current duties, and had Ms. Denvir's confirmation of that suspicion. One can only assume, then, that Ms. Augustin nevertheless believed that the job she was proposing – presumably for herself to fill – was something <u>different</u> from the Senior Manager job. The Court cannot say that Ms. Denvir allowing Ms. Augustin to propose a different position for herself was somehow evidence of age discrimination by Ms. Denvir. Finally, Ms. Augustin takes issue with Ms. Denvir "making no meaningful effort to help her find a new job at DaVita and hiring a younger, unqualified employee into the role of Senior Manager." But these events occurred <u>after</u> Ms. Augustin chose not to apply for the Senior Manager job, and thus can hardly be evidence of Ms. Denvir somehow discouraging Ms. Augustin from applying.

The Court therefore finds that Ms. Augustin has failed to come forward with evidence that would demonstrate that DaVita's reason for not hiring her as Senior Manager – that she failed to apply for the position – is somehow false and a pretext for age discrimination. Ms. Augustin also makes an abbreviated argument that DaVita should have inferred her interest in the position, given that she was already performing the position's duties. It was clear that Ms. Augustin was aware of the Senior Manager opening and her ability to apply for it, and it was also clear that Ms. Augustin chose to forego such an application, apparently in furtherance of her hopes that DaVita would instead create the new position she was proposing. In such circumstances, she cannot show that DaVita's refusal to consider her for a Senior Manager position she chose not to apply for was a pretext for age discrimination.

Accordingly, DaVita is entitled to summary judgment on Ms. Augustin's claims. Because Ms. Augustin's claims are factually distinct from those of the remaining Plaintiffs, the Court sees no just reason for delaying the entry of judgment in DaVita's favor on her claims

pursuant to Fed. R. Civ. P. 54(b), and such judgment shall therefore issue contemporaneously with this Order.

4. Ms. Landin

Ms. Landin was hired by DaVita as an Executive Assistant in 2014, when she was approximately 49 years old.  Her immediate supervisor was Marty McGuirk.  Mr. McGuirk reported to Dan Viaches, and Mr. Viaches had ultimate supervisory responsibility for the entire team of Executive Assistants.

Ms. Landin candidly acknowledges that "issues" arose among the Executive Assistants in late 2015.  Those issues primarily involved Catherine Lischer and Leah Schust, two fellow Assistants that Ms. Landin characterizes as less experienced (and whom Ms. Landin initially trained).  Ms. Landin states that Ms. Lischer and Ms. Schust would "overwhelm[ ] her with questions concerning Mr. McGuirk's schedule," even though the information they were seeking was available electronically.  Ms. Landin brought these concerns to Mr. McGuirk, who was supportive of her and encouraged her to continue doing what she was doing.  Ms. Lischer and Ms. Schust, however, complained about Ms. Landin directly to Mr. Viaches, who "blamed the Executive Assistants not getting along on Ms. Landin."  This led to a difference of opinion between Mr. McGuirk and Mr. Viaches about the quality of Ms. Landin's work and whether she deserved a pay raise.  Because Mr. Viaches had final authority on such questions, Ms. Landin was not considered for a raise at that time.

In March 2016, DaVita's legal team contacted Ms. Landin about allegations that another employee had made in a separate wage and hour lawsuit against DaVita.  Ms. Landin told the legal team that she believed that the employee had a legitimate claim.  Ms. Landin contends that, thereafter, Mr. Viaches "became more aggressive towards her and his criticisms of her ramped

up." (Notably, however, in her deposition, Ms. Landin acknowledged that she had no personal knowledge as to whether Mr. Viaches even knew about her phone call with DaVita's legal team.) Ms. Landin's summary judgment response gives a single example, referring to an instance in which Mr. Viaches sent her an e-mail directing her to work with Ms. Lischer to reschedule a meeting when Ms. Landin had already done so.[7]

At the time of her performance review in March 2016, Ms. Landin complained to Mr. McGuirk that "I felt that Dan Viaches was treating me unfairly and I didn't understand why." (Ms. Landin's brief characterizes this statement as Ms. Landin telling Mr. McGuirk that "she believed she was being discriminated against by Mr. Viaches," but Ms. Landin's deposition testimony on the subject is limited to her expressing her confusion as to why Mr. Viaches would ask her to train the other Assistants, and then, "all of a sudden, I'm the bad person and was being blamed for everything his [Assistants] weren't doing correctly.") When Ms. Landin received her performance review, she was told that Mr. Viaches was not approving her for a raise, even though he had approved raises for the other Assistants. Ms. Landin states that Mr. McGuirk told her that Mr. Viaches was withholding any raise for her until the "issues" with the other Assistants were resolved. Shortly thereafter, Ms. Landin was given a document that showed the salaries being paid to each of the Executive Assistants. She learned that she was being paid less than Ms. Lischer and Ms. Schust, among others, despite having more experience than they did.

In June 2016, Ms. Landin had a phone conversation with Mr. Viaches about her performance. At the conclusion of that call, Ms. Landin told Mr. Viaches that she believed that he was discriminating against her because of her age and sex. Mr. Viaches responded that

---

[7]     Later in her summary judgment response, Ms. Landin refers to an incident in May 2016, where Ms. Landin and Ms. Schust disagreed on how best to schedule an executive retreat. Ms. Schust complained to Mr. Viaches about Ms. Landin's behavior, and Mr. Viaches allegedly directed Mr. McGuirk to write up Ms. Landin. It is not clear whether Mr. McGuirk ever did so.

"that's bull. That's not true," and the conversation ended. Ms. Landin also reported her belief

that Mr. Viaches was discriminating against her to DaVita's "People Services" (apparently, its

Human Resources department). Although Ms. Landin's brief states that she "did not know that

her [complaint] had been investigated at all," she testified that she had a telephone conversation

with a representative from People Services.

On July 18, 2016, Ms. Landin tendered her resignation to DaVita. In her brief, she states

that this was "because of Mr. Viaches' favoritism of his younger Executive Assistants, his

constant criticisms of her, and his hostility after she spoke with DaVita's counsel" about the co-

worker's claims. In her deposition, she acknowledged that she was not being threatened with

termination and had not received any "corrective actions," but that she felt she had to leave "due

to the hostile work environment that [Mr. Viaches] was creating for me."

Based on these facts, Ms. Landin asserts seven claims: (i) age discrimination in violation

of the ADEA; (ii) age discrimination in violation of CADA; (iii) sex discrimination in violation

of Title VII of the Civil Rights Act; (iv) sex discrimination in violation of CADA; (v) retaliation

for engaging in protected activity, in violation of the ADEA; (vi) retaliation for engaging in

protected activity, in violation of CADA; and (vii) retaliation for engaging in protected activity

in violation of Title VII.

DaVita seeks summary judgment on all of Ms. Landin's claims. As to her claims of age

and sex discrimination, DaVita primarily argues that Ms. Landin cannot show that she suffered

an adverse employment action; in response, Ms. Landin contends that her resignation was a

constructive discharge, and that she was subjected to counseling and criticism for her job

performance, and was given a performance review that was "negatively influenced by Mr.

Viaches' feedback" and denied a raise therefor. She also contends that she was paid less than

younger workers, demonstrating discrimination on the basis of her age,[8] and DaVita responds that she lacks evidence to show that she was paid less than younger Executive Assistants. As to her retaliation claims, DaVita argues that Ms. Landin cannot show that she suffered any adverse employment action and cannot show that any such actions were causally connected to her protected conduct.

### a. Sex discrimination claims

The Court begins by summarily granting summary judgment to DaVita on Ms. Landin's sex discrimination claims. Even assuming that any or all of Ms. Landin's claimed adverse actions suffice for a *prima facie* case, Ms. Landin has not come forward with any evidence that suggests that any of the conduct directed against her was because of her sex. All of the Executive Assistants she alleges were treated more favorably than she was are female, and she has not identified any allegedly sex-based comments made by Mr. Viaches towards her or anyone else. The only evidence Ms. Landin can proffer on the issue of sex discrimination is that she is female and Mr. Viaches, the alleged decisionmaker, is male. This is insufficient to establish a *prima facie* case of sex discrimination.[9]

---

[8]    Ms. Landin makes a single-paragraph argument that she was paid less than similarly-situated male employees in "Pegasus," an otherwise undefined work unit. Ms. Landin's deposition discusses the Pegasus unit only briefly, explaining that "Marissa [otherwise unidentified] does way more work than Jeff [otherwise unidentified] does, and she's paid way less than Jeff." It does not appear that Marissa or Jeff are Executive Assistants, or that Ms. Landin has any other evidence to support a contention that she herself was subjected to pay discrimination on the basis of her sex. Thus, the Court does not explore this claim further.

[9]    This also suffices to dispose of Ms. Landin's Title VII retaliation claim. Even under the "mistaken good-faith belief" standard of *Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 385 (10th Cir. 1984), Ms. Landin could not have harbored a good faith belief that Mr. Viaches' conduct constituted sex discrimination. She has identified no meaningful facts that would allow her to form a reasonable belief that Mr. Viaches' conduct towards her was based on her sex.

### b. Age discrimination claims

(i) underlined adverse employment action

That leaves her claims for age discrimination. As to those claims, the Court first considers Ms. Landin's contentions that she was constructively discharged to establish the existence of an adverse employment action. A constructive discharge occurs where, because of an employer's discriminatory conduct, "the working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 136 S.Ct. 1769, 1776-77 (2016). The Court's evaluation of a constructive discharge claim "disregard[s] both the employee's subjective view of the workplace environment and the employer's subjective intentions regarding the employee." *Sotunde v. Safeway, Inc.*, 716 Fed.Appx. 758, 768 (10th Cir. 2017). It is not enough to show that the working conditions were "difficult or unpleasant"; the employee must show that, objectively, a reasonable person would have viewed the working conditions as intolerable. *Id.*

The Court finds that Ms. Landin has not demonstrated a triable issue as to whether she was constructively discharged. The crux of Ms. Landin's situation is that she sometimes had difficulties in getting along with her younger co-workers, and that Mr. Viaches would – perhaps unfairly -- take the co-workers' side when disputes arose. These circumstances might be "difficult or unpleasant" for a conscientious employee, but they fall far short of being "intolerable." *See e.g. Sotunde*, 716 Fed.Appx. at 769 (poor performance reviews, a manager discrediting the employees work and spreading rumors that the employee "would not be there much longer," and the employer's failure to investigate complaints of discrimination did not amount to constructive discharge); *Sanchez v. Denver Pub. Schools*, 164 F.3d 527, 534 (10th Cir. 1998) (employer favoring younger co-workers did not amount to constructive discharge). Ms.

Landin had an array of options to deal with the situation that stopped short of resignation: she could simply avoid conflict with her co-workers (and thus criticism by Mr. Viaches), by working the way they wanted to, even if that meant doing tasks inefficiently. She could have followed up on her single complaint of discrimination to People Services, sought assistance from Mr. Viaches' own supervisors, or asked Mr. McGuirk or others to intercede with Mr. Viaches on her behalf. She could have requested a transfer or reassignment of certain job duties to remove the need to interact with the troublesome co-workers. Or she could have simply bided her time, unpleasant as that might have been, given that she was never threatened with termination or subjected to any significant discipline. The Court does not intend to disparage the frustration that Ms. Landin must have felt, being treated with disrespect by her co-workers and supervisor despite being skilled and efficient at her job. But the standard for establishing a constructive discharge is a considerable one, and the fact that Ms. Landin was criticized, even unfairly, on a handful of occasions by Mr. Viaches fails, as a matter of law, to rise to that standard.

Ms. Landin argues that several cases from the 10th Circuit would support a finding that she could establish a claim for constructive discharge. The Court finds the cases inapposite. In *Acrey v. American Sheep Industry Ass'n*, 981 F.2d 1569, 1573-74 (10th Cir. 1992), the court affirmed a jury's finding of constructive discharge where two different supervisors urged the employee to quit and threatened her with discharge if she did not. Similarly, in *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1152-1154 (10th Cir. 1990), there was evidence that an employee's manager threatened to fire the employee, stated that the employee was "fired or going to be fired," and gave the employee an ultimatum to either take early retirement or be fired and lose his benefits. *Accord Burk v. Oklahoma Pub. Co.*, 81 F.3d 975, 978 (10th Cir. 1996) (considering whether constructive discharge jury instruction is appropriate where evidence shows that

employee "truly was presented with a choice between resigning or being fired"). These cases are clearly distinguishable from the facts presented by Ms. Landin here. Mr. Viaches' criticism of Ms. Landin's performance never rose to the level of a request for Ms. Landin's resignation or threatening her with termination if she did not resign. Thus, the Court finds that Ms. Landin has not come forward with evidence sufficient to create a triable issue of whether she was constructively discharged; rather, the evidence establishes that her resignation was voluntary.

Turning to the other examples of alleged adverse employment actions, the Court first considers Ms. Landin's allegation that DaVita paid younger Executive Assistants a higher salary than it paid her. The sole support for this contention is a statement by Ms. Landin that, at some point during her employment, she received a document from a co-worker that showed the salaries of various Assistants, and that Ms. Landin's salary was lower than that paid to her younger co-workers. Ms. Landin testified that she no longer has this document and that she did not know whether it was an official DaVita payroll document or from some other source. She attests to no other personal knowledge of her co-workers' salaries. DaVita, on the other hand, has produced an affidavit that specifically recites the salaries of each of the Executive Assistants, showing that Ms. Landin earned more the Ms. Lischer and Ms. Schust, and that the only Assistant paid more than Ms. Landin was Janelle Ramos, who is only one year younger than Ms. Landin. Ms. Landin has not come forward with evidence that disputes that produced by DaVita, and thus, the Court finds that Ms. Landin has not shown that she suffered an adverse employment action in the form of being paid less than younger co-workers.

Finally, the Court considers whether Mr. Viaches criticizing her work or favoring complaints against her by her co-workers arises to the level of an adverse employment action. To be sufficiently adverse, an employment action must be material, amounting to a firing, failure

to promote, reassignment with significantly different duties, or a decision causing a significant change in benefits. *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017). Events such as counseling, criticism, or a verbal warning do not typically rise to the level of adverse actions, absent a showing that they affected an employee's pay or prospects for advancement or discipline. *See Anderson v. Clovis Mun. Schools*, 265 Fed.Appx. 699, 704 (10th Cir. 2008). Most of Mr. Viaches' criticisms of Ms. Landin would not suffice under this standard, but the Court notes that on two occasions, once in late 2015 and again in conjunction with her performance review in March 2016, Mr. Viaches refused to approve Ms. Landin for a raise that had been recommended for her. Because the denial of a raise can constitute a significant change in pay or benefits, the Court finds that Ms. Landin has sufficiently demonstrated that Mr. Viaches' refusal of raises for her constitute adverse employment actions.

(b) circumstances giving rise to an inference/pretext

The next question is whether the denial of those raises occurred in circumstances giving rise to an inference of age discrimination. At a minimum, the March 2016 denial of a raise to Ms. Landin permits such an inference, insofar as Ms. Landin alleges that younger co-workers were given a raise, yet she was not. DaVita contends that Ms. Landin lacks personal knowledge that the other Assistants received raises, but her deposition testimony is clear that "the other [Assistants] got a raise, and I didn't." The record does not reflect an exploration into Ms. Landin's basis for that knowledge, and the Court will not speculate one way or the other as to how she came to that knowledge. Notably, DaVita has not come forward with evidence that establishes that the other Assistants did <u>not</u> receive raises in March 2016.

DaVita's motion papers do not address the reasons why Ms. Landin was refused a raise in March 2016, and thus, the Court need not move onto the pretext stage. Ms. Landin's age

discrimination claims will proceed to trial, limited to the issue of Mr. Viaches' denial of a raise for her in March 2016.

### c. Retaliation claims

That leaves Ms. Landin's claims for retaliation for complaining of age discrimination, in violation of the ADEA and CADA. Although the record reflects that Ms. Landin formally complained of age discrimination to Mr. Viaches (and then DaVita's People Services) in June 2016, Ms. Landin's summary judgment briefing does not identify this event as supporting her ADEA and CADA retaliation claims.[10] Rather, she focuses on her March 2016 discussion with DaVita's legal team, in which she stated her support for a co-worker's pending suit against DaVita.[11] Thus, the Court examines whether Ms. Landin can establish a *prima facie* case of retaliation with regard to that protected activity.

Ms. Landin seems to argue that Mr. Viaches increased his criticism of Ms. Landin as a result of her supporting Ms. Oldershaw's lawsuit in the discussion with DaVita's legal team. But

---

[10]     Even if Ms. Landin did premise her retaliation claims on her June 2016 complaints of discrimination to Mr. Viaches, for the reasons stated above, the Court would find that Ms. Landin has not shown that DaVita took any adverse employment action against her thereafter. The only meaningful event remaining in the chronology at that point was her resignation in July 2016, which the Court has already determined does not amount to a constructive discharge.

[11]     The record is unclear as to whether there are facts to support the statutory basis for such a claim. The Court understands that the conversation between Ms. Landin and DaVita concerned whether Ms. Landin would give a deposition in pending litigation between DaVita and employee Kelsey Oldershaw. As far as the Court can discern, the only pending litigation involving Ms. Oldershaw and DaVita at this point in time would have been *Oldershaw v. DaVita Healthcare Partners, Inc.*, D.C. Colo. L. Civ. Case No. 15-cv-01964. That case concerns allegations that DaVita was failing to pay overtime wages required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* To the extent that Ms. Landin alleges that she was retaliated against for assisting in Ms. Oldershaw's FLSA lawsuit, the appropriate statutory vehicle is not the ADEA's (or CADA's, or Title VII's) anti-retaliation provisions, but rather, the FLSA's. 29 U.S.C. § 215(a)(3). Ms. Landin has not alleged FLSA retaliation, but DaVita has not challenged her retaliation claims on this basis. Ultimately, for the reasons set forth above, the Court need not resolve this particular puzzle.

as DaVita points out, Ms. Landin has not alleged, and apparently cannot allege, that Mr. Viaches ever actually knew about her discussions with DaVita's legal team. Ms. Landin acknowledged in her deposition testimony that neither Mr. McGuirk nor Mr. Viaches was present during her discussions with DaVita's legal team, and that after that meeting, she did not discuss the meeting with either Mr. McGuirk or Mr. Viaches.[12] She acknowledges that, when she alleges that Mr. Viaches stepped up his criticism of her after she met with the legal team, she is only speculating that Mr. Viaches knew of that meeting. Mr. Viaches has submitted his own affidavit denying any knowledge of any discussions Ms. Landin had with DaVita's legal team until after she had already resigned. Thus, Ms. Landin has failed to come forward with evidence that creates a genuine dispute of fact as to whether Mr. Viaches was aware of her discussions with DaVita's legal team. That defect is fatal to her retaliation claim(s), as no inference of causation can arise without a showing that the decisionmaker actually knew of the employee's protected conduct. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). Accordingly, DaVita is entitled to summary judgment on Ms. Landin's retaliation claims.

Thus, the Court grants DaVita's motion for summary judgment against Ms. Landin in all respects, save for Ms. Landin's claims of age discrimination under the ADEA and CADA with regard to the denial of her raise in March 2106. Only that portion of those claims will proceed to trial.

---

[12] Ms. Landin points to another portion of her deposition, where she indicates that she talked to Mr. McGuirk about whether Ms. Oldershaw should retain an attorney. It is not clear from the record when this discussion occurred – *e.g.* before or after Ms. Landin's discussions with DaVita's legal team (one would assume before Ms. Oldershaw commenced the 2015 lawsuit, as she was represented by counsel thereafter) . Ultimately, the Court need not consider the matter further because Ms. Landin does not allege that she ever had such discussions with Mr. Viaches (or even that Mr. McGuirk conveyed her sentiments to Mr. Viaches).

5. <u>Ms. Navarro's claims</u>

Ms. Navarro was hired by DaVita in 2003 and worked there until December 2015. At the times pertinent herein, she held the position of Facility Administrator, responsible for managing employees and operations at DaVita's Westminster, Colorado facility.  Her direct supervisor was initially James Hein and later Jan Sheetz, both of whom were supervised by Paul Asper.

Ms. Navarro contends that, upon assuming indirect supervision over her in 2013, Mr. Asper was unjustifiably critical of her performance.  In January 2014, Mr. Asper told her that he expected that she would not have any of her employees defect to a competitor, a requirement that she believed was impossible, given budget restrictions and a lack of corporate support.  Ms. Navarro did her best, but in September 2014, Ms. Asper criticized her for the performance of the Westminster clinic and placed Ms. Navarro on a Performance Improvement Plan ("PIP").

During that discussion, Mr. Asper observed that Ms. Navarro was not a "team player," because she was not attending informal, off-duty social events and gatherings of DaVita employees.  Ms. Navarro stated that she felt uncomfortable attending such events, because the events often involved often heavy drinking and pressure to consume alcohol.  Ms. Navarro explained that she has a seizure disorder, and that as a result, she does not drink.  Mr. Asper replied that he did not expect her to "booze it up" at the gatherings, and Ms. Navarro responded that "it seemed to me that he did."

Ms. Navarro successfully completed her PIP in November 2014, and in early 2015, she was promoted to Facility Administrator.  Nevertheless, she continued to struggle with an inadequate budget for her clinic and seeming indifference from Mr. Asper.  In October 2015, Ms. Sheetz placed Ms. Navarro on a second PIP, directing her to improve her facility's DQI score – an internal measure of a facility's patient outcomes – within 45 days.  Ms. Navarro remarked that

because DQI scores measured 90-day periods, it would be impossible to show improvement during the PIP period.  Ms. Sheetz agreed, but encouraged Ms. Navarro to nevertheless attempt to show some improvement.  In December 2015, Ms. Sheetz met again with Ms. Navarro, acknowledging that she had been harsh on Ms. Navarro in order to cause her to quit, and stated that Ms. Asper did not want Ms. Navarro to continue working for DaVita.  Ms. Sheetz said that if Ms. Navarro did not resign, Ms. Asper would find a way to terminate her.  Ms. Navarro then tendered her resignation.[13]

Based on these facts, Ms. Navarro asserts six claims: (i) sex discrimination in violation of Title VII; (ii) sex discrimination in violation of CADA; (iii) disability discrimination in violation of the ADA; (iv) disability discrimination in violation of CADA; (v) retaliation for engaging in protected activity, in violation of the ADA; and (vi) retaliation for engaging in protected activity (on the basis of disability), in violation of CADA.

DaVita seeks summary judgment on all of Ms. Navarro's claims.  As to her sex discrimination claims, it contends that she cannot demonstrate that her termination arose in circumstances giving rise to an inference of sex discrimination or show that its proffered reason for her termination – poor performance – is a pretext for sex discrimination.  As to her disability claims, it contends that she cannot show that she is "disabled," as defined by the ADA, cannot show that she was qualified for her position, cannot show that her termination occurred in circumstances giving rise to an inference of discrimination, or show that DaVita's reason for her termination was pretextual.  As to her retaliation claim, DaVita alleges that she cannot show a causal connection between her revealing her medical condition to Mr. Asper and her termination.

--------

[13]     DaVita takes the position that it terminated Ms. Navarro's employment.

### a. Sex discrimination claims

The Court accepts that Ms. Navarro has established the first three components of a *prima facie* case of sex discrimination – that she is female, that she met the minimum objective qualifications for her position, and that she suffered an adverse employment action, namely termination. The Court then turns to the question of whether she can show that her termination occurred in circumstances giving rise to an inference of sex discrimination. An employee seeking to satisfy this element may do so in a variety of ways: by showing discriminatory comments by decisionmakers, showing that similarly-situated male employees were treated more favorably, by showing that the employee was replaced with a male, or, more generally, by showing suspicious timing or sequences of events leading up to the termination. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).

Ms. Navarro's summary judgment brief on this point first digresses into a complaint that DaVita "refused to turn over critical evidence relating to" various subjects, "warranting denial of [DaVita's motion] pursuant to Fed. R. Civ. P. 56(d)." The Court finds that Ms. Navarro has not made the showing necessary to obtain relief pursuant to Rule 56(d). *See generally Milam v. Pafford EMS*, 729 Fed.Appx. 632, 635 (10th Cir. 2018) (requiring an affidavit explaining why facts cannot be presented, the probable facts that exist, what steps were reasonably taken to obtain those facts, and a showing that the requesting party had not been dilatory in obtaining them). Among other things, Ms. Navarro blames DaVita moving to quash her notice for a Fed. R. Civ. P. 30(b)(6) deposition, served on the eve of the discovery deadline, arguing that such a deposition would have yielded the information she needs to oppose summary judgment. The motion to quash was granted **(# 65)** by the Magistrate Judge a few days before Ms. Navarro filed her summary judgment response. Ms. Navarro did not thereafter seek to reopen discovery or

otherwise obtain the information she seeks. Thus, even if the Court were to grant Ms. Navarro additional time to marshal evidence in opposition to DaVita's motion, the record reflects that she would be unable to do so. Accordingly, the Court denies her request for relief under Rule 56(d).

Ms. Navarro proffers several items that, she contends, suggest Mr. Asper's sex-based bias against her. The Court briefly examines each. First, she recites an instance from 2013, when she provided Mr. Asper with extensive information relating to a DaVita initiative, only to have Mr. Asper "not meaningfully respond and admit[ ] he had not looked at the reports." At best, this suggests that Mr. Asper might be a neglectful, indifferent, or non-communicative manager, but it does not give any reason to suggest that Mr. Asper ignored the reports because of Ms. Navarro's sex. Next, Ms. Navarro points to Ms. Sheetz' alleged statement that Ms. Asper did not like Ms. Navarro. Putting aside the hearsay problems with such an assertion – Ms. Navarro has not offered any affidavit or testimony from Ms. Sheetz acknowledging such a statement, making it impossible for the Court to treat the statement "Ms. Asper did not like me" as true – again, the mere fact that Mr. Asper did not like Ms. Navarro does not permit an inference that it was because of her sex; Mr. Asper may not have liked Ms. Navarro's personality, her performance, her attitude, or any of a host of characteristics unrelated to her sex.

That leaves Ms. Navarro's argument that she was treated less favorably than similarly-situated male employees by Ms. Asper. She points to three males in particular. First, she notes that Cole Casey was "promoted to [Facility Administrator] after only three months as an [Assistant]," apparently in contrast to Ms. Navarro who apparently spent two years as an Assistant before being promoted. Beyond that bare statement, and her assumption that her facility's QCI scores were higher than Mr. Casey's (because Ms. Navarro's QCI scores were the highest in Colorado), Ms. Navarro does not demonstrate how she would be similarly-situated to

Mr. Casey in any other respect. She admitted in her deposition that she was not familiar with Mr. Casey's performance evaluations nor was aware of the criteria by which Mr. Casey's facility was measured. Without a showing that she was similarly-situated to Mr. Casey in all material respects relating to the decision to promote an Assistant to Facility Administrator, Ms. Navarro has not shown that Mr. Casey's situation permits an inference of sex discrimination to be drawn. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

Ms. Navarro also points to Nathan Gabor. Mr. Gabor was issued a PIP by Mr. Asper in March 2015 and was asked to resign in July 2015, due to ongoing performance problems. It appears that Ms. Navarro believes that Mr. Gabor was treated more favorably than she was because DaVita gave Mr. Gabor one month to find another job at DaVita in lieu of termination, whereas it did not give her an opportunity to look for other work within DaVita. However, given that Ms. Navarro was on her second PIP when she was terminated, whereas Mr. Gabor was on his first, the Court cannot conclude that Mr. Gabor and Ms. Navarro were similarly-situated in all material respects. Moreover, as DaVita notes, the performance deficiencies that DaVita noted in Mr. Gabor's PIP and in Ms. Navarro's are different, with Ms. Navarro's citing to criticism she was receiving from her subordinates whereas Mr. Gabor's cited his lack of knowledge of DaVita's processes. Under these circumstances, the Court cannot say that Ms. Navarro has sown that she was similarly situated to Mr. Gabor, such that the different ways in which their terminations were handled reflects sex discrimination on Mr. Asper's part.

Finally, Ms. Navarro points to Jim Winders. She contends that Mr. Asper acknowledged that she was paid less than Mr. Winders, and that Mr. Winders was not criticized for failing to attend off-premises social gatherings. Ms. Navarro's deposition makes clear that she has no knowledge of whether Mr. Asper was criticized or disciplined for not attending social gatherings,

making that argument irrelevant.  As to the mere fact that Ms. Navarro was paid less than Mr. Winders, Ms. Navarro has offered no additional evidence to show that she was similarly-situated to Mr. Winders in all other respects, such that differential pay rates could only be explained by sex discrimination. Thus, Ms. Navarro's attempts to compare herself to male employees fails to warrant an inference that Mr. Asper discriminated against her on the basis of her sex.

Lastly, Ms. Navarro states that her co-Plaintiff, Ms. Stant, also "was targeted for termination" by Mr. Asper, and that Ms. Stant knew of another woman, Sandi Vanek, who was terminated at Mr. Asper's request.  As to Ms. Vanek, Ms. Navarro offers only Ms. Stant's hearsay testimony about what Ms. Vanek told Ms. Stant.  And Ms. Navarro offers no meaningful summary of Ms. Stant's own interactions with Mr. Asper.[14]

Accordingly, the Court finds that Ms. Navarro has failed to establish a *prima facie* case of sex discrimination and DaVita is entitled to summary judgment on those claims.

### b. Disability discrimination/retaliation claims

The Court will bypass DaVita's arguments that Ms. Navarro cannot show that she is disabled for purposes of the ADA and cannot show that she met the minimum qualifications for her position.  Instead, the Court finds that Ms. Navarro's ADA claims fail at the fourth step of the *prima facie* case, because Ms. Navarro cannot show that her termination occurred in circumstances giving rise to an inference that it was based on her seizure disorder.  As the recitation above suggests, Mr. Asper criticized Ms. Navarro for not attending DaVita social gatherings, and Ms. Navarro explained that her disorder prevented her from drinking.  Mr. Asper responded that she was not required to drink in order to attend the social events.  Ms. Navarro

---

[14]     The Court declines to comb through Ms. Stant's response in support of her own claims to ascertain whether there are facts there that could assist Ms. Navarro.  The parties chose to present each individual Plaintiffs' claims separately for purposes of dispositive motions, and thus, the Court treats each motion independently of each other.

has not come forward with evidence that shows that Mr. Asper's statement was somehow untrue – for example, she does not contend that she subsequently attended a gathering and was forced to drink alcohol. Thus, the record reflects that she was given specific permission by Mr. Asper to <u>not</u> drink at the social gatherings because of her disorder. In such circumstances, the Court cannot draw any inference that Ms. Navarro's medical disorder was related to her termination, and DaVita is entitled to summary judgment on her disability discrimination claims.

Similar reasoning dispels Ms. Navarro's disability retaliation claims. Assuming – without necessarily finding – that Ms. Navarro's report of her condition to Mr. Asper constitutes protected activity under the ADA, the record reflects that, rather than retaliating against her, Mr. Asper specifically accommodated her seizure disorder by telling her that she did not have to drink alcohol at the social gatherings. In any event, the record also reflects that Ms. Navarro cannot show any causal connection between her discussion of her condition with Mr. Asper in September 2014 and her termination more than a year later (or, for that matter, her placement on the second PIP in October 2015). A causal connection between the protected conduct and adverse action can be inferred if they occur in close temporal proximity – say, less than three months; otherwise, a plaintiff alleging retaliation must come forward with additional evidence demonstrating causation. *Winston v. Ross*, 725 Fed.Appx. 659, 665 (10th Cir. 2018). Ms. Navarro has not come forward with evidence to suggest that the decision to place her on a PIP and ultimately terminate her was caused by her discussion of her condition with Mr. Asper.

Accordingly, DaVita is entitled to summary judgment on all of Ms. Navarro's claims. For the reasons discussed above, judgment pursuant to Fed. R. Civ. P. 54(b) shall enter immediately.

6. Ms. Oldershaw's claims

Ms. Oldershaw was hired by DaVita as an Executive Assistant in 2014, and later was named a Divisional Coordinator,[15] primarily supporting Benjamin Stapleton, Brain Saito, and Ian Wong. They, in turn, were supervised by Margaret Anderson.

In March 2015, Ms. Oldershaw was issued a performance evaluation that contained both praise and identified areas for improvement. She was given an overall grade of "meets expectations," and was awarded a merit raise.

In May 2015, Ms. Oldershaw requested leave time off to undergo surgery and recovery. When she informed Mr. Stapleton, he was unhappy about it and responded that the timing was inconvenient, given an upcoming business event. He asked what the surgery was for, and when Ms. Oldershaw informed him that it had to do with her reproductive organs, he "got red" and immediately responded that he didn't want to hear any more. Thereafter, Mr. Stapleton began criticizing grammatical and punctuation mistakes in e-mails that Ms. Oldershaw sent, and criticized her for calling to ask him questions.

On July 4, 2015, Ms. Oldershaw complained to Human Resources representative Kelly Kolb that Mr. Stapleton was "retaliating against" her.[16] On July 6, 2015, on the eve of her surgery, Ms. Oldershaw again spoke to Mr. Stapleton about her impending absence. Mr.

---

[15]     There is some dispute between the parties as to whether the Divisional Coordinator position was a demotion or lateral transfer from the Executive Assistant position. This dispute need not be resolved for purposes of this Order.

[16]     Curiously, Ms. Oldershaw cites only to Mr. Stapleton's deposition in support of this fact, not her own. Mr. Stapleton states that Ms. Oldershaw "mentioned to Kelly Kolb [an HR Representative] in or around July 4 . . . that she was being retaliated against." Later, Ms. Oldershaw cites to Ms. Kolb's deposition testimony about this same complaint. Ms. Kolb testified that Ms. Oldershaw "stated that she felt like [Mr. Stapleton] was – I can't remember the wording exactly, whether it was harassing behavior or the environment, something to that effect."

Stapleton again repeated that her absence would be inconvenient. Then he advised her that, due to performance problems, he was placing her on a PIP.

Ms. Oldershaw returned from her leave on or about July 12, 2015. Mr. Stapleton continued to send her e-mails critiquing the contents of e-mails she was sending, and on July 22, 2015, called her and told her that she was not showing improvement and should consider looking for another job. Mr. Stapleton also directed that Ms. Oldershaw's access to DaVita's network be terminated for several days, effectively ending her ability to perform her duties. DaVita formally terminated Ms. Oldershaw's employment on August 3, 2015.

Based on these allegations, Ms. Oldershaw asserts seven claims: (i) sex discrimination under Title VII, (ii) sex discrimination under CADA; (iii) disability discrimination under the ADA; (iv) disability discrimination under CADA; (v) retaliation for engaging in protected activity under the ADA; (vi) retaliation for engaging in protected activity under CADA; and (vii) retaliation for engaging in protected activity under Title VII.[17]

As to the sex discrimination claims, DaVita moves for summary judgment contending that Ms. Oldershaw cannot show that she was qualified for her position,[18] that she was terminated under circumstances giving rise to an inference of sex discrimination, or that DaVita's proffered reason for her termination – poor performance – is pretextual. As to the

---

[17]    The Court notes that Ms. Oldershaw has not invoked either the anti-discrimination or anti-retaliation provisions of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a).

[18]    The Court reflexively rejects this argument in nearly all the forms that DaVita urges it. For purposes of a *prima facie* case, Ms. Oldershaw need only show that she met the minimum objective requirements for her job – *e.g.* a certain educational degree or a designated number of years of experience. *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193-94 (10th Cir. 2000). She is not required to show that she was performing the job to DaVita's satisfaction, as that conflates the minimal requirements of the *prima facie* case with the question of whether an employer's performance-based explanation for an adverse action is pretextual. *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir. 1992) ("the employer's reasons for the adverse action are not appropriately brought as a challenge to the sufficiency of the plaintiff's *prima facie* case").

disability discrimination claims, DaVita contends that Ms. Oldershaw cannot show that she is

disabled or that DaVita regarded her as such, that she was qualified for her position, or that her

termination occurred in circumstances giving rise to an inference of disability discrimination.  As

to her retaliation claims, DaVita alleges that Ms. Oldershaw cannot show a causal connection

between her request for time off for surgery and her termination, and cannot show that DaVita's

reasons for her termination are pretextual.

### a.  Sex discrimination claims

Assuming that Ms. Oldershaw establishes all the other elements of her *prima facie* case,

the Court agrees with DaVita that she has failed to come forward with any evidence that permits

a reasonable inference that Mr. Stapleton terminated her because of her sex.  Ms. Oldershaw

does not point to sexist comments by Mr. Stapleton or point to any particular evidence that

would indicate that his actions towards Ms. Oldershaw were motivated by sexist bias.  Ms.

Oldershaw does not identify similarly-situated male Divisional Coordinators whom Mr.

Stapleton treated more favorably.[19]  Ms. Oldershaw appears to rely upon "the timing and

sequence of events," pointing to "issuance of a PIP shortly after Ms. Oldershaw's request for

---

[19]     Ms. Oldershaw's brief contains a single sentence and citation referencing "another teammate who used inappropriate language in e-mails," to whom Mr. Stapleton issued only a written warning rather than a PIP.  She does not describe the teammate, the circumstances, or anything else to put this event in any kind of context.  It is Ms. Oldershaw's obligation to sufficiently set forth the pertinent evidence, and the Court is not obligated to comb the record for her.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).
        Even if the Court were to consider several additional pages of Mr. Stapleton's deposition transcript on this point, it would learn that the "teammate" in question was Andy Kulyk, a male, who was "a vice president who does business development."  Mr. Kulyk was being issued a warning, rather than a PIP, in part because Mr. Stapleton was correcting a specific incident of Mr. Kulyk not complying with DaVita standards, not a situation where Mr. Kulyk's overall performance was unsatisfactory.  Moreover, Mr. Stapleton explained that the decision to give Mr. Kulyk a written warning was made by "our entire compliance team."  Thus, to the extent Ms. Oldershaw seeks to compare herself to Mr. Kulyk, she has not shown that they shared a similar job title or responsibilities, that they violated rules of comparable seriousness, and that the disciplinary decisions in question were made by the same supervisor.

time off . . . and termination less than a month later." But while such timing might be indicative of <u>some</u> form of animus, it does nothing to suggest that <u>sex-based</u> animus was at play. Civil rights statutes are not all-purpose tools, used indiscriminately to strike at the heart of any employment decision that might seem inappropriate or unfair; to the contrary, they are precise instruments that are applicable only in narrowly-defined circumstance. It is the burden of a plaintiff to invoke the proper statute and demonstrate the facts that warrant its application. Here, because Ms. Oldershaw has not come forward with any evidence to suggest that Mr. Stapleton treated her unfairly because she is <u>female</u>, she fails to demonstrate a triable *prima facie* case of sex discrimination. DaVita is entitled to summary judgment on her claims for sex discrimination.

### b. Disability discrimination claims

DaVita contends that Ms. Oldershaw cannot show that she is a member of a class protected by the ADA or CADA's disability discrimination prohibitions, because she is not "disabled" under those statutes' definitions.

Under the ADA, an employee is "disabled" if they have a physical or mental impairment that substantially limits one or more of their major life activities. 42 U.S.C. § 12012(1)(A). Ms. Oldershaw has not argued that she suffered from any actual disability. Rather, under the ADA, an employee who is not actually disabled is nevertheless protected by the statute if they are "regarded as having such an impairment" by their employer. 42 U.S.C. § 12102(1)(C). However, an employee who is regarded by their employer as having an impairment of "transitory and minor" duration – one of "6 months or less" – is not considered "disabled" under the ADA. 42 U.S.C. § 12102(3)(B). The regulations implementing the ADA emphasize that the phrase "transitory and minor" is to be read in the disjunctive – an employer does not regard an

employee as disabled only if its understanding is that the alleged impairment is both "transitory" and also "minor." 29 C.F.R. § 1630.15(f).[20] There can be little dispute that Ms. Oldershaw's need for surgery and recovery was "transitory" – Ms. Oldershaw made clear to Mr. Stapleton that she would need three days for surgery and three weeks to recover and there is nothing to suggest that Mr. Stapleton misunderstood that duration. Thus, the only question is whether Mr. Stapleton nevertheless considered Ms. Oldershaw's impairment to be something other than "minor." Neither the ADA nor its regulations nor courts have attempted to offer a more precise definition for the term "minor" in this context.

Ms. Oldershaw's response on this issue is curious. She contends that Mr. Stapleton must have regarded her as having more than a "minor" impairment because he "claim[ed] to HR [that] Ms. Oldershaw would be 'bedridden' or 'completely disabled' after surgery." In support of this contention, Ms. Oldershaw points only to her own deposition testimony, which relates the following events occurring on July 6, 2015, after she reminded Mr. Stapleton of her upcoming surgery (and Mr. Stapleton mentioned that her absence would be "inconvenient"):

> And then I went back to my desk. Shannon [Gibbons, an HR representative] e-mailed me probably five minutes later and said: You need to come to my office right now. Ben [Stapleton] just came racing into my office – these were her exact words – and said you were going to be, quote, bedridden for three weeks. So please come talk to me privately. . . And Shannon's e-mailing me that Ben's perceiving me to have this major, like, disability from some surgery that I think I'm going to go back to work for three days later. . . Because what Ben told her, I was going to be completely disabled. And she was all of a sudden surprised by it.

---

[20] The ADA's implementing regulations seem to suggest that the "transitory and minor" limitation is an affirmative defense on which the employer bears the burden of proof. *See Budhun v. Reading Hosp. and Medical Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014). Regardless of how one apportions the burden of proof here, the analysis and outcome is the same.

Several aspects of this recitation require unpacking. DaVita has produced (and Ms. Oldershaw has confirmed) the e-mail Ms. Gibbons sent to Ms. Oldershaw that Ms. Oldershaw references. It reads, in its entirety "Hey Kelsey, Ben just came [to] my office and mentioned that you might be on leave for 3 weeks. Have you called Hartford and put in for a leave? You must apply for FMLA and/or short-term disability. Please make sure you do this." Obviously, the words "bedridden" and "major disability" are not found in Ms. Gibbons' e-mail (notwithstanding Ms. Oldershaw's assurance that "these were her exact words"). Parsing Ms. Oldershaw's deposition carefully, the Court understands her to be saying that Ms. Gibbons conveyed Mr. Stapleton's words to her orally, during a meeting Ms. Oldershaw had personally with Ms. Gibbons shortly after the e-mail. (Ms. Gibbons' testimony suggests that she met in person with Ms. Oldershaw first, and the e-mail was just confirming the conversation). These alleged oral recitations by Ms. Gibbons raise interesting hearsay issues, both in the Mr. Stapleton to Ms. Gibbons context, and in Ms. Gibbons' statements to Ms. Oldershaw. Ms. Oldershaw's summary judgment response elides the hearsay question entirely, even though she relies solely upon her own recitation of Ms. Gibbons' recitation of Mr. Stapleton's statements.

The Court is loathe to form arguments for parties where the parties themselves have failed to do so. Ultimately, however, it need not address the admissibility of these statements because the Court finds that, even taking Ms. Oldershaw's recitation of the discussion with Ms. Gibbons as true and admissible, the evidence does not permit a conclusion that Mr. Stapleton considered Ms. Oldershaw's impairment to be anything other than "minor." Careful review of Ms. Oldershaw's deposition testimony is that Mr. Stapleton's words, conveyed through Ms. Gibbons, were simply that Ms. Oldershaw would be "bedridden for three weeks." Ms. Oldershaw does not attribute the expression "major [ ] disability" to Mr. Stapleton or Ms.

Gibbons; rather, it reflects her characterization of what Ms. Gibbons said. Ms. Oldershaw makes

clear that "bedridden for three weeks" was Ms. Gibbons' "exact words" and "quote[d]." But she

states that the expression "major, like, disability" was something mentioned in Ms. Gibbons' e-

mail; as we see, that e-mail mentions "disability" only in the context of Ms. Oldershaw filing for

short-term disability benefits. Thus, the record permits only a finding that Mr. Stapleton may

have regarded Ms. Oldershaw's impairment as being one that renders her "bedridden for three

weeks." That statement alone, with its inherent temporal limitation, does not permit the

conclusion that Mr. Stapleton considered Ms. Oldershaw's impairment to be anything more than

a minor and temporary inconvenience. *Accord Horsham v. Fresh Direct*, 136 F.Supp.3d 253,

263-64 (E.D.N.Y. 2015) (employer who understood employee to need six weeks to recover from

hernia surgery did not regard him as disabled; employer "perceived that Plaintiff had only a

temporary impairment").

Accordingly, the Court finds that Ms. Oldershaw has not shown that she can establish the

first element of a *prima facie* case of disability discrimination under the ADA, because she was

not "disabled" for purposes of the statute's coverage. Moreover, because CADA incorporates by

reference the ADA's standards defining disability, her disability-based CADA claim fails as

well. C.R.S. § 24-34-301(5.6). DaVita is therefore entitled to summary judgment on her

disability discrimination claims.

### c. Retaliation claims

DaVita's challenge to Ms. Oldershaw's retaliation claims is limited to the causal

connection element (and, ultimately, the question of pretext). This is problematic, as it assumes

the existence of conduct that, Ms. Oldershaw claims, is protected under Title VII (as to sex), the

ADA, and CADA (as to both sex and disability). It is not immediately apparent to the Court how

Ms. Oldershaw's request for leave to undergo surgery is conduct that would be "opposing" sex discrimination or "assist[ing] or participat[ing] in" a investigation or proceeding under Title VII or CADA. 42 U.S.C. § 2000e-3(a). Moreover, given the discussion above, it is unclear that her request for leave to undergo a surgery and brief recovery time would even be conduct protected under the ADA (as opposed to, say, the FMLA). Thus, it is not entirely clear to the Court that Ms. Oldershaw has engaged in any protected activity that would support any of her retaliation claims. Nevertheless, as noted above, the Court avoids resolving matters on issues the parties have not raised, and thus, the Court will assume – for purposes of this motion only – that Ms. Oldershaw can establish that she engaged in protected activity under all three statutes.[21]

Turning to the question of causation, the 10th Circuit has recognized that close temporal proximity between the protected conduct and adverse action – say, a period of six weeks -- can, of itself, supply the requisite causal inference. *Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1231 (10th Cir. 2004). Here, the parties appear to agree that Ms. Oldershaw's protected conduct occurred on or about July 6, 2015, when she reminded Mr. Stapleton of her need for time off for her surgery. Mr. Stapleton advised her on July 22, 2015 that she needed to look for another job, effectively terminating her on that date, and DaVita formally terminated her by August 3, 2015, all within a roughly four-week period. Accordingly, the Court finds that Ms. Oldershaw has demonstrated a causal connection sufficient to establish a *prima face* case of retaliation.

The Court need not extensively explore the question of pretext. DaVita claims that it terminated Ms. Oldershaw for poor work performance. Ms. Oldershaw has come forward with evidence that her work performance was adequate, including a performance review that rated her

---

[21]    Ms. Oldershaw is advised that the Court will closely scrutinize her Statement of Claims in her Proposed Pretrial Order to determine whether she has sufficient facts to permit each of her retaliation claims to proceed to trial. Those claims that lack a sufficiently-identified factual and legal basis may be dismissed as insufficient at the time of the Pretrial Conference.

as "meets expectations" and a merit raise immediately before the events at issue. The record reflects that although Mr. Stapleton gave Ms. Oldershaw 30 days to improve via the PIP, he instructed her to begin looking for a job only a few days into that 30-day period, rather than allowing her the allotted time to improve. Moreover, the close temporal proximity between Ms. Oldershaw's protected conduct and her termination is also demonstrative of pretext on DaVita's part. *DePaula v. Easter Seals El Mirador,* 859 F.3d 957, 976 (10th Cir. 2017) (temporal proximity can be considered evidence of pretext in conjunction with other evidence suggesting retaliatory motive). Accordingly, the Court finds that Ms. Oldershaw has demonstrated a genuine dispute of fact with regard to the pretext element of her retaliation claims, and those claims will proceed to trial.

      7. <u>Ms. Stant</u>

Ms. Stant worked for DaVita for more than 25 years, finally occupying the position of Regional Educator in 2011 when she was approximately 51 years old. She was supervised by Tamyra Warmack, who was, in turn, supervised by Mr. Asper.

The events leading to Ms. Stant's separation from DaVita began on December 4, 2015, following a training seminar that Ms. Stant delivered to several trainees. Mr. Asper and Elizabeth Wright spoke with the trainees after the seminar, asking about, among other things, their impressions of the training. According to DaVita, all seven trainees (and others associated with the training) reported negatively about Ms. Stant, complaining that Ms. Stant "screamed at [them]" on the treatment floor, that she was "condescending" and "belittling," and that she did not seem to get along with her co-presenter, among other things. Mr. Asper and Ms. Wright brought these concerns to Ms. Warmack's attention, demanding that Ms. Stant be removed from further training and that she be placed on final written warning status, the highest possible

discipline short of termination.   Ms. Warmack reported the allegations to DaVita's human resources department for investigation.

The human resources department completed its investigation on or about December 18, 2015 and reported the results to Ms. Warmack, who conveyed them to Ms. Stant.  Ms. Stant states that Ms. Warmack confirmed that the allegations were found to be unfounded, but Ms. Warmack told her that Ms. Asper still wanted her placed on final written warning status.  Ms. Stant asked "So eventually I'm going to be fired?  So I should look for another position?," and Ms. Warmack agreed with her.  Believing that her job was in jeopardy, Ms. Stant resigned her employment with DaVita on February 19, 2016.  She was 56 years old at that time.

Based on these facts, Ms. Stant brings four claims: (i) age discrimination in violation of the ADEA; (ii) age discrimination in violation of CADA; (ii) sex discrimination in violation of Title VII; and (iv) sex discrimination in violation of CADA.

DaVita seeks summary judgment on her claims, arguing that she cannot show that she suffered an adverse employment action and cannot show that any such action occurred in circumstances giving rise to an inference of discrimination.

Like Ms. Landin, Ms. Stant's claims rise or fall depending on whether she has come forward with a colorable claim that she was constructively discharged.  The Court finds that she has not.  Putting aside all other evidence (including undisputed evidence that Mr. Asper left Ms. Stant's chain of command shortly after the initial event and that nobody else involved in that chain is alleged to have actively continued to press for Ms. Stant to be disciplined), the record reflects that Mr. Asper demanded only that Ms. Stant be placed on final written warning status, not that she be terminated.  The assumption that "eventually I'm going to be fired" is a conclusion that Ms. Stant jumped to on her own and without any supporting evidence that the

situation was likely to persist beyond the single incident relating to specific training program. Indeed, Ms. Warmack's affidavit, which Ms. Stant relies upon, states that Ms. Warmack believed that Mr. Asper "would more than likely continue to try and get her terminated," but that Ms. Warmack "was her supervisor and we would work [ ] together" with DaVita's human resources department to fight those efforts. Thus, even Ms. Stant's own supervisor believed that Ms. Stant had options short of resignation. In such circumstances, the Court cannot find that Ms. Stant has come forward with evidence that could establish that, objectively, she had no other choice but to quit. *Compare Keller v. Crown Cork & Seal USA, Inc.*, 491 Fed.Appx. 908, 915 (10th Cir. 2012) (employee written up for poor performance and threatened with termination failed to establish constructive discharge). Because Ms. Stant's alleged constructive discharge is the sole adverse employment action that supports all of her claims, DaVita is entitled to summary judgment on all of those claims.

8. Summary

For these reasons, DaVita is entitled to summary judgment on all of Ms. Augustin, Ms. Navarro, and Ms. Stant's claims against it, and partial judgments pursuant to Fed. R. Civ. P. 54(b) shall promptly enter against these Plaintiffs. Ms. Landin's age discrimination claims under the ADEA and CADA will proceed to trial, limited to the question of whether Mr. Viaches' withholding of a raise she was otherwise eligible for was the product of age discrimination. Ms. Oldershaw's claims that she was terminated in retaliation for engaging in protected conduct under Title VII, the ADA, and CADA will proceed to trial.[22]

_____

[22] Because Ms. Landin's remaining claims share no common questions of law or fact with Ms. Oldershaw's claims, it is the Court's intention to try their claims in separate trials before separate juries. The parties shall prepare separate Proposed Pretrial Orders for each Plaintiff, addressing only the scope of trial of that Plaintiff's claims, although for purposes of expediency, the Court will hold a single Pretrial Conference as to both Plaintiffs.

**B. DaVita's Motion to Amend**

DaVita moves to amend its Answers against Ms. Oldershaw and Ms. Landin to include an affirmative defense of after-acquired evidence. The doctrine of after-acquired evidence creates an affirmative defense that allows an employer to avoid liability for frontpay and some backpay damages if it shows that it discovered, mid-litigation, that a plaintiff engaged in heretofore unknown misconduct during his or her employment that would have warranted the employee's termination had that conduct been known to the employer during the employment. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361-62 (1995). Here, DaVita states that, during discovery in this action, it learned that Ms. Oldershaw and Ms. Landin tape recorded workplace conversations without permission, in violation of DaVita's workplace rules. DaVita argues that, had it known about Ms. Oldershaw's and Ms. Landin's actions, it would have independently terminated their employment for those reasons.

As to Ms.Landin, because the Court grants summary judgment to DaVita on her claims relating to her termination, this motion is moot. The relief that Ms. Landin can recover on her remaining claims entails only a withheld raise, not frontpay (or even backpay that accrued after DaVita learned of her recording activities).

Ms. Oldershaw argues in response to DaVita's motion that DaVita's proposed defense is futile, as DaVita cannot show that, under its policies, termination (as opposed to lesser discipline) would necessarily have resulted from DaVita learning that an employee was surreptitiously recording workplace conversations. Ms. Oldershaw's argument thus challenges whether DaVita can prove its defense of after-acquired evidence, whereas the question before the Court is whether DaVita should be allowed to plead that defense. Because DaVita has articulated a colorable basis for raising the defense at this time, its motion is granted. Whether

the jury will ultimately be instructed on the defense is a matter that will be taken up at the time of trial, based on the evidence presented.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** DaVita's Motions for Summary Judgment against Ms. Navarro **(# 57)**, Ms. Augustin **(# 60)**, and Ms. Stant **(# 61)**.  There being no just reason to delay entry of judgment, the Clerk of the Court shall immediately enter partial judgments in favor of DaVita and against these Plaintiffs pursuant to Fed. R. Civ. P. 54(b).

DaVita's Motions for Summary Judgment against Ms. Landin **(# 58)** and Ms. Oldershaw **(# 59)** are **GRANTED IN PART AND DENIED IN PART** as set forth herein.  The parties shall begin preparation of two Proposed Pretrial Orders, consistent with the requirements of the Trial Preparation Order **(# 24)**, with regard to the remaining claims and shall jointly contact chambers to set a Pretrial Conference.  The Court **GRANTS** DaVita's Motion to Amend **(# 38)** its Answer to assert an after-acquired evidence defense against Ms. Oldershaw's claims, and the Court deems DaVita's Answer to be so amended.

The Court **DENIES, AS MOOT** DaVita's Motion to Amend **(# 50)** its Answer as to Ms. Landin.

Dated this 1st day of August, 2018.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge